David L. JEFFERSON, Appellant,

v.

UNITED STATES, Appellee.

Anthony M. STREETER, Appellant,

v.

UNITED STATES, Appellee.

Nos. 87–393, 87–445.

District of Columbia Court of Appeals.

Argued Feb. 2, 1989.
Decided April 27, 1989.

Craig Iscoe, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

Daniel M. Schember, Washington, D.C., appointed by the court, for appellant Jefferson.

Page Kennedy, Public Defender Service, with whom James Klein, Washington, D.C., Public Defender Service, was on the brief, for appellant Streeter.

Before ROGERS, Chief Judge, and MACK and TERRY, Associate Judges.

ROGERS, Chief Judge:

Appellants David L. Jefferson and Anthony Streeter were convicted of three counts of attempted robbery while armed with a pistol, D.C.Code §§ 22–2902, –3202 (1981, 1988 Supp.), and carrying a pistol without a license, id. §§ 22–3204, –3215. They were acquitted of felony murder, id. §§ 22–2401, –2404. Because of their conviction of attempted robbery while armed with a real pistol, the jury did not reach the question of their guilt on the additional charge of attempted robbery while armed with an imitation pistol, id. §§ 22–2902, –3202.

On appeal appellants raise several claims of error, only one of which we find meritorious. Assuming, as appellants argue, that the trial judge abused his discretion in allowing the government to impeach its witness with a prior inconsistent statement pursuant to D.C.Code § 14–102 (1981), the error was harmless. Although part of the prosecutor's closing argument to the jury impermissibly implied that witnesses did not testify because they were afraid to do so, we find no ground for reversal of their convictions. However, we agree with appellants that there was insufficient evidence to convict them of carrying a dangerous weapon on an aiding and abetting theory, and since that was the only theory on which the jury was instructed, they are each entitled to a judgment of acquittal on that count. Accordingly, we reverse their convictions for carrying a dangerous weapon and otherwise affirm.

I.

The crimes charged grew out of a street encounter in which appellants were identified as two of the three gunmen who accosted government witnesses Izzard and McNeil (along with a third victim who was killed) during an attempted robbery. At about 9:00 p.m. on September 13, 1985, six men were confronted by three men holding guns. Two of the gunmen wore ski masks over their faces and the third gunman wore a hat and had black camouflage paint on his face. Three of the six men ran down the street leaving the victims, Izzard, McNeil and Featherstone. One of the gunmen wearing a ski mask told McNeil to face the wall. The gunman with the painted face held Izzard to the ground. The third gunman pointed his gun at McNeil and grabbed Featherstone. A month later Izzard and McNeil reported the attempted robbery to the police, and identified appellants Streeter and Jefferson in a police photo array and again at trial.

Izzard identified his assailant as appellant Streeter whom he had known for two years, played basketball with and seen box at the gym. Although his assailant was wearing a ski mask, Izzard testified that he could see his eyes, nose, mustache, and part of his mouth through the holes in the mask and that he recognized Streeter's

voice. Izzard also testified that he had seen Streeter walk by the area with appellant Jefferson about thirty minutes earlier, asking who was selling drugs. McNeil identified his assailant as appellant Jefferson whom he knew by his nickname "Percy," and, in fact, on the night of the robbery he had told his assailant, "Percy, get the fuck off me."

Neither Izzard nor McNeil identified Featherstone's assailant. While the gunman holding Izzard told him to put everything he had into his bag, the unidentified third gunman searched Featherstone. Two shots rang out, somebody shouted, "Run," and Featherstone ran. Two more shots were fired, and the three assailants ran away. A man named Matthew Jackson ran up and fired two or three shots. Featherstone died from gunshot wounds. As Izzard's assailant fled, McNeil noticed that he was knock-kneed and on that basis identified him as appellant Streeter.

Shawn Johnson, a sixteen-year-old boy who lived in the neighborhood, also testified for the government. He was walking home sometime after dark when he saw a man walk out of Streeter's house across the street and join two other men. Johnson thought this man was appellant Streeter because he saw his mustache, but admitted he did not see his face and that Streeter and his brothers "looked alike" and that it also could have been one of Streeter's friends. Johnson also identified one of the other men as appellant Jefferson with whom he had shot craps and seen play basketball. Although he barely knew Jefferson, he thought the person was Jefferson because both Jefferson and the person outside the house were knock-kneed. Johnson volunteered, however, that the person he saw may not have been Jefferson since Jefferson "ain't the only person in the world with knees like that."

Johnson also testified that the men were zipping up their coats but claimed that he could not be certain what they were doing and that they could have been doing any-

thing. The three were wearing hats, although Johnson was uncertain about what kind of "hats" they were wearing. He denied that he had seen them put on anything other than hats.[1] At this point the prosecutor, asserting surprise, requested permission to impeach Johnson with a signed statement he had given to the police and affirmed before the grand jury. In the statement Johnson said he had seen "three guys on the side of my house putting on heavy coats and masks." Appellants argued that the government knew Johnson was a difficult witness who was uncertain in his testimony. The trial judge found that the government was surprised and that Johnson's testimony affirmatively damaged the government's case because his failure to mention the masks was "critical in a case in which the victims never saw the robbers without masks."

Upon further direct examination, Johnson testified that two of the men had hats on and that he saw them put something other than the hats inside their pockets. He admitted making a statement to the police and affirming it before the grand jury. But when confronted with its contents, he expressed the same equivocation as before.

> I can't say that it was but it was, you know, it was a hat or something, some type, you know, something that, you know, hat or something.

The judge instructed the jury at the conclusion of Johnson's direct examination that his prior inconsistent statement could only be used to impeach his credibility and not for the truth of the matter asserted.

## II.

Appellants contend that the trial judge erred in permitting the prosecutor to impeach Johnson with a prior statement on the ground that the government was surprised by his trial testimony. They contend that the impeachment was improper since Johnson simply failed to give expected testimony and did not affirmatively

---

1. He testified:
   I couldn't really see who had them because I wasn't, you know, trying to stay there all day, you know, see what they were doing. But, you know, I saw—saw them had some type of hats or something.

damage the government's case. Johnson did not exculpate appellants, they point out, but placed the three gunmen together near the scene of the crime shortly before the attempted robbery and described them as wearing some sort of headgear. All that happened is that Johnson failed to produce testimony that was as definite as his grand jury testimony and this inconsistency, therefore, did not constitute surprise under D.C.Code § 14–102 (1981).

■ A party can impeach its own witness with a prior inconsistent statement under D.C.Code § 14–102 only if the party "has been taken by surprise by the testimony of the witness." [2] *In re L.D.O.*, 400 A.2d 1055, 1058 (D.C.1979) (specifically rejecting Fed. R. of Evid. 607), and can demonstrate "affirmative damage to its case as well." *Scott v. United States*, 412 A.2d 364, 367–68 (D.C.1980) ("The sole reason such impeachment is permitted is to cancel or neutralize any damaging effect of the surprising testimony."). Thus, statements can be used only to neutralize affirmative harm, and not "to supply the anticipated testimony." *Scott, supra*, 412 A.2d at 368 (quoting *Young v. United States*, 97 F.2d 200 (5th Cir.1938)). As appellants point out, without affirmative harm, the jury will wonder why the government is producing the prior statement and is likely to consider the prior statement for the impermissible purpose of strengthening the government's case rather than repairing any damage that may have been done.

■ That the statute permits impeachment where a witness has made a statement to a party or his attorney that is "substantially variant from his sworn testimony about material facts in the case" does not change the standard. For example, in *Price v. United States*, 545 A.2d 1219 (D.C.1988), the court affirmed the decision of the trial court permitting the government to impeach a witness with grand jury testimony that identified the defendant as the assailant when the witness testified at trial that a stranger was involved. Applying the "affirmative damage" standard of *Scott, supra*, the court pointed out that the witness' testimony "tended to injure or destroy" the government's case. *Id.* at 1225. Our decisions have also focused on the state of the prosecutor's knowledge about the witness' testimony and noted that impeachment is improper where the prosecutor has prior knowledge that the witness will not give expected testimony. *See, e.g., Price, supra*, 545 A.2d at 1224; *Scott, supra*, 412 A.2d at 369. We review the trial court's determination of whether a party is surprised for abuse of discretion. *Scott, supra*, at 367 (citing *Robinson v. United States*, 113 U.S. App. D.C. 372, 308 F.2d 327 (1962), *cert. denied*, 374 U.S. 836, 83 S.Ct. 1887, 10 L.Ed.2d 1058 (1963)).

Appellants maintain that the government's purpose in impeaching Johnson was to discredit his testimony that he saw the men putting on hats. They point out that this testimony did not harm the government's case. Although Johnson's testimony that he saw "hats or something" was not as helpful to the government as testimony that he saw "masks," the government still could argue that Johnson thought he saw appellant Streeter putting something on his head right before the robbery in which the gunmen had their heads covered. Accordingly, appellants argue that the real value of Johnson's prior statement was to convince the jury that Johnson saw the gunmen putting on masks.

■ The trial judge ruled that the government's case had been affirmatively damaged by Johnson's failure to testify

---

**2.** D.C.Code § 14–102 (1981) provides:

When the court is satisfied that the party producing a witness has been taken by surprise by the testimony of the witness, it may allow the party to prove, for the purpose only of affecting the credibility of the witness, that the witness has made to the party or to his attorney statements substantially variant from

his sworn testimony about material facts in the case. Before such proof is given, the circumstances of the supposed statement sufficient to designate the particular occasion must be mentioned to the witness, and he must be asked whether or not he made the statements and if so allowed to explain them.

about seeing the gunmen with masks.[3] Although we are reluctant to find that the trial judge abused his discretion, appellants' arguments are not persuasively met by the government. As a neutral third party observer, had Johnson testified that he saw the gunmen putting on masks, Johnson's testimony would have provided further corroboration of Izzard's and McNeil's testimony, but it was hardly critical to the government's case. While the prosecutor may well have been genuinely surprised by Johnson's denial that he saw more than "hats or something," this would appear to be less than the kind of affirmative damage contemplated by our decisions interpreting § 14–102 and more like the failure of a witness to produce hoped-for testimony. The government's argument that our decision in *Price, supra,* replaced the "affirmative damage" standard with a lesser standard of "tends to injure or destroy" is simply a misreading of our decision.

But we are satisfied that any trial court error was harmless precisely because of the strong eyewitness testimony against appellants. *See Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946); *Gordon v. United States,* 466 A.2d 1226, 1231 (D.C. 1983). The victims knew their assailants and referred to the fact that two of the gunmen wore masks. Their identification testimony was otherwise corroborated by Johnson's unimpeached testimony. Moreover, nothing in the record suggests that the jury did not follow the instructions on the limited use that it could make of Johnson's prior statement. *Christian v. United States,* 394 A.2d 1, 23 (D.C.1978), *cert.*

*denied,* 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979).

### III.

■ Appellants also contend that the prosecutor made impermissible arguments to the jury. First, they object to the prosecutor's argument to the jury that Johnson "knew in his heart" that the man he saw coming out of appellant Streeter's house was actually Streeter. Based on Johnson's equivocal testimony that it was his "opinion" that the man was appellant Streeter without giving details as to how he could identify him, and the trial judge's instructions to the jury that they should only consider evidence and that the lawyers' arguments were not evidence, we find no plain error.[4] The comment was a fair inference from the evidence. *See Streater v. United States,* 478 A.2d 1055, 1058–59 (D.C.1984); *Tuckson v. United States,* 364 A.2d 138, 142 (D.C.1976).

■ Second, appellants object to the prosecutor's implication in his closing argument that other witnesses had been intimidated from coming to court to testify. The prosecutor argued to the jury that

> Because in Eastgate, probably like other parts of Washington, D.C., a whole lot of people might see things but not a whole lot of people have the courage to come forward and take the witness stand.

Appellants contend that this argument impermissibly asked the jury to infer that appellants had threatened witnesses, thereby explaining why several of the witnesses introduced by the government during jury voir dire did not testify at trial, and also that fear of appellants explained why Izzard and McNeil had waited a month be-

---

**3.** In the trial judge's words:

> I think it's disingenuous to say the least to say that the witness has not done affirmative damage to the Government's case relative to what [the prosecutor] says he expected the witness to say. Which is what they were— which is that he's sure it was Mr. Streeter and he is sure it was Mr. Jefferson and they were donning masks when he saw them. Which of course is critical in a case in which the victims never saw the robbers without masks. And you've made those points on cross-examination.

> So whatever the test for affirmative damage means, it certainly means what happened here.

**4.** Since appellants did not object to the first alleged misstatement of which they complain on appeal, our review is for plain error. *McCowan v. United States,* 458 A.2d 1191, 1196–97 (D.C. 1983) (citing *Watts v. United States,* 362 A.2d 706, 709 (D.C.1976) (en banc). Otherwise, we review for substantial prejudice. *McCowan, supra,* 458 A.2d at 1196.

fore going to the police to report the alleged robbery. The inference was improper for both appellants. The prosecutor had no evidentiary basis for such an inference as to appellant Streeter. As to appellant Jefferson, the argument also was improper since the trial judge had ruled inadmissible evidence that Jefferson's brother had threatened the government's witness, Shawn Johnson. Nevertheless, we are satisfied that the comments did not substantially prejudice appellants. *See McCowan, supra,* 458 A.2d at 1198–99. Not only were many of the comments directed at explaining the lack of evidence against appellants on the felony murder charge, of which appellants were acquitted, but there was no mention of any specific threatening acts. *Cf. Hayward v. United States,* 136 U.S. App. D.C. 300, 304 n.5, 420 F.2d 142, 146 n.5 (1969) (prosecutor pointed out that police interviewed 40–50 witnesses, but only a few would testify, and that defendant's two brothers sat in the courtroom). The judge instructed the jury not to speculate on what other evidence might exist that was not introduced at trial. The government concedes that "[i]t is a close question whether the prosecutor should have suggested that it required a lot of courage for Johnson to come into court and testify." Still, the identification evidence of appellants was strong without Johnson's testimony insofar as the armed robbery charge was concerned, and the judge instructed the jury about statements of counsel not being evidence. *See Sherrod v. United States,* 478 A.2d 644, 658–59 (D.C. 1984).

### IV.

■ Finally, appellants[5] contend that there was insufficient evidence that either of them had aided and abetted the unidentified third gunman, who was the only gunman carrying an operable pistol. No evidence was offered that the unidentified third gunman did not have a license to carry his pistol. Since aiding and abetting was the only theory on which the jury was instructed, appellants maintain, and we agree, that they could not be convicted of carrying a dangerous weapon on the theory of constructive possession and are entitled to judgments of acquittal.

The trial judge instructed the jury on felony murder and armed robbery, explaining that appellants could be found guilty as principals even if they only aided and abetted the crime.[6] Immediately thereafter, the judge instructed the jury on carrying a pistol without a license, stating,

> The theory of this count, as with the others I have mentioned, some of the others I have mentioned, is that they are chargeable under the law with carrying a pistol that is alleged to have been carried by the third robber, who is alleged to have carried an operable pistol.

The judge further defined the elements of carrying a pistol without a license, explaining that

> A pistol is carried openly or concealed, on or about the defendant's person, if it is actually on his person or if it is located in such proximity to him as to be convenient of access and within his reach.

■ The government concedes that under *Jackson v. United States,* 395 A.2d 99 (D.C.1978), a defendant cannot be convicted of carrying a pistol without a license on an aiding and abetting theory where there is no proof that the person in actual possession of the pistol did not have a license to

---

**5.** Only appellant Streeter challenges his conviction for carrying a pistol without a license, contending that the trial judge erred in denying his motion for a judgment of acquittal. However, the government states in its brief that it would not oppose reversal of Jefferson's conviction for carrying a pistol without a license if the court reverses Streeter's conviction. Accordingly, we treat this issue as raised by both appellants.

**6.** The judge instructed:

> A person aids and abets another in the commission of a crime if he knowingly associates himself in some way with the criminal venture with the intent to commit the crime, participates in it as something he wishes to bring about, and seeks by some action of his to make it succeed. Some conduct by the defendant at the time and place of the commission of an offense is not by itself sufficient to establish his guilt. However, mere presence is enough if it is intended to and does aid the primary actor.

carry it. However, it maintains that the trial judge's instructions were sufficiently broad to cover an instruction on the theory of constructive possession. We disagree. The instructions to the jury made no reference to the elements required for constructive possession and "the failure to instruct the jury on every essential element of the crime is per se reversible 'plain error,' notwithstanding a defendant's failure to object to the instructions as given." *McGee v. United States*, 533 A.2d 1268, 1270 (D.C. 1987) (quoting *Kind v. United States*, 529 A.2d 294, 295 (D.C.1987)).

Constructive possession requires two elements: knowledge of the presence of the object, and the right to exercise dominion over it, or stated differently, the "ability to guide [its] destiny." *United States v. Hubbard*, 429 A.2d 1334, 1338 (D.C.1981), *cert. denied*, 454 U.S. 857, 102 S.Ct. 308, 70 L.Ed.2d 153 (1981). While mere proximity to an illegal item does not of itself prove knowledge coupled with dominion or control, *Curry v. United States*, 520 A.2d 255, 263 (D.C.1987) (citing *Johnson v. United States*, 503 A.2d 686, 688 (D.C.1986) (per curiam)), "presence, proximity or association may establish a prima facie case of constructive possession if it is colored by evidence linking the accused to an ongoing criminal operation of which that possession is a part." *Id.* (citing *Hubbard, supra*). *See also United States v. Staten*, 189 U.S. App. D.C. 100, 107, 581 F.2d 878, 885 (1978).

Appellants do not assert that they lacked knowledge, but that they did not have the ability to exercise dominion over the pistol since the third man held it at all times in his hand. On this ground they distinguish the cases in which drugs or firearms were found in a car. *See, e.g., Logan v. United States*, 489 A.2d 485 (D.C. 1985). The government responds that the three men were engaged in joint criminal activity, thereby allowing the imputation of control over the pistol by all three individuals. Arguably, it maintains, if one of the men had yelled, "Give me the gun," the unidentified man might have given it to him. However, that would have required

his independent decision to relinquish the weapon which he may or may not have decided to do at that particular point. In order for either appellant to exercise control over the weapon, the person in actual possession, exercising actual control over the object, must actively relinquish it, something which is open to question under the facts of the instant case. In any event, the jury never had the opportunity to consider this issue since the judge did not instruct them on the proper elements necessary to convict appellants of constructive possession of a pistol.

Accordingly, appellants' convictions for possession of a pistol without a license are reversed, and they are entitled to a judgment of acquittal on that count.

Affirmed in part, reversed in part.